[Crim. No. 17574. In Bank. May 1, 1975.]

In re WAYNE D. EARLEY on Habeas Corpus.

## COUNSEL

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., and Jack R. Winkler, Chief Assistant Attorneys General, Edward P. O'Brien and William E. James, Assistant Attorneys General, Robert R. Granucci and Ronald E. Niver, Deputy Attorneys General, for Appellant.

William K. Rentz and James S. Hurwitz for Respondent.

OPINION

**BURKE, J.**\*—This is an appeal by the People from a Marin County Superior Court order granting a writ of habeas corpus. (See Pen. Code, § 1506.)[1] The People's sole contention is that the court erred in determining that Wayne D. Earley's conduct was not prohibited by section 209 (kidnaping for the purpose of robbery) as construed in *People* v. *Daniels*, 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677].

In 1967 Earley was found guilty by a jury in the Alameda County Superior Court on one count of kidnaping for the purpose of robbery (§ 209) and one count of first degree robbery (§§ 211, 211a) and was sentenced to prison on each count.[2] The judgment was affirmed on appeal. ■ . Thereafter we reinterpreted section 209 in *Daniels*, and *People* v. *Mutch*, 4 Cal.3d 389, 396 [93 Cal.Rptr. 721, 482 P.2d 633], relying on the principle in *In re Zerbe*, 60 Cal.2d 666, 667-668 [36 Cal.Rptr. 286, 388 P.2d 182, 10 A.L.R.3d 840], held that a defendant is entitled to habeas corpus relief under *Daniels* "if there is no material dispute as to the facts relating to his conviction and if it appears that the statute under which he was convicted did not prohibit his conduct." It is only where it appears as a matter of law that the defendant's conduct did not violate the statute under which he was convicted that the defendant is entitled to collateral relief under *Zerbe*. (See *People* v. *Timmons*, 4 Cal.3d 411, 416 [93 Cal.Rptr. 736, 482 P.2d 648] [conc. & dis. opn. by Sullivan, J.]; *In re Howard*, 21 Cal.App.3d 318, 321 [98 Cal.Rptr. 531]; *In re Madrid*, 19 Cal.App.3d 996, 1003 [97 Cal.Rptr. 354].)

After *Daniels* Earley filed several motions to recall the remittitur on the ground that his conduct did not violate section 209 as construed in that decision. The motions were denied, and we denied hearings. He then filed in this court a habeas corpus petition on the same ground, and we denied the petition. He subsequently filed in the Marin County Superior Court a petition for habeas corpus on the same ground as well as an unrelated one, and an order to show cause was issued limited to the question of the validity of the section 209 conviction in the light of *Daniels*. Following the filing of the return and the traverse thereto, the

---

\*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

[1]All section references hereafter are to the Penal Code.

[2]Execution of the sentence on count one (robbery) was stayed pending appeal and service of the sentence on count two (kidnaping for the purpose of robbery) the stay to become permanent upon completion of the sentence on count two.

court determined that Earley's conduct did not violate section 209 as construed in *Daniels,* and the court filed an order vacating the judgment of conviction and remanding the case to the Alameda County Superior Court for resentencing on the robbery count and to permit Earley to renew his applications for probation and reduction of the charges. As heretofore stated, the People have appealed.

### 1. *The Facts*

About 4:50 a.m. on July 22, 1967, Werner Schopfer, Jr., stopped at a stop sign at a lighted intersection at East 14th Street and 77th Avenue in Oakland. Earley, who was wearing sunglasses, walked up to the driver's side of the car and stuck an object through the window. Schopfer thought the object was a gun, but it apparently was a gun-like cigarette lighter.[3] Earley told Schopfer to move over, and Schopfer complied. Earley got into the car and drove east on East 14th Street a block or two, turned onto a dark side street and eventually stopped away from any street lights, in the middle of a block on a side street named Holly near 86th Avenue, a distance of some 10 to 13 blocks.

During the drive whenever Schopfer looked at Earley, Earley waved the apparent gun at Schopfer and said something to the effect that Schopfer was making him nervous and that Earley "should just kill" Schopfer. Schopfer did not remember whether they passed any other cars. After stopping on Holly Street, Earley demanded and received Schopfer's wallet and watch. Earley then fled on foot. He took the car keys with him but left them at a nearby corner as he had promised to do. It does not appear that Schopfer was physically injured.

### 2. *The* Daniels *Test*

As a preliminary matter, it is necessary to consider the exact nature of the *Daniels* test. The People assert that it is only if both prongs of that test are met that a conviction of kidnaping for the purpose of robbery (§ 209) is invalid under *Daniels.*

*Daniels* stated (at p. 1139), "we hold that the intent of the Legislature in amending Penal Code section 209 in 1951 was to exclude from its reach not only 'standstill' robberies (e.g., *People* v. *Knowles,* . . . 35 Cal.2d 175 [217 P.2d 1]) but also those in which the movements of the victim are

---

[3]When Earley was arrested he had in his possession a derringer-style cigarette lighter. Schopfer testified that it looked like the object that Earley stuck in the car window.

merely incidental to the commission of the robbery *and* do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself. [Italics added.] (See Note, *Room-to-Room Movement: A Risk Rationale for Aggravated Kidnapping . . .* 11 Stan.L.Rev. 554, 555; Note, *A Rationale of the Law of Kidnapping . . .* Colum.L.Rev. 540, 554-557.)"[4]

Some authorities have indicated that, if the movement is not merely incidental to the robbery, a conviction under section 209 is not invalid under *Daniels* irrespective of whether there is an increase in danger to the victim under the second prong of the *Daniels* test. (E.g., *People* v. *Stathos,* 17 Cal.App.3d 33, 38-39 [94 Cal.Rptr. 482]; see *In re Bryant,* 19 Cal.App.3d 933, 937-938 [97 Cal.Rptr. 40] [conc. opn.]; 59 Cal.L.Rev. 180, 189.)[5]

On the other hand from language in the majority opinion in *People* v. *Thornton, supra,* 11 Cal.3d 738, it may be inferred that movements of a victim can constitute kidnaping for the purpose of robbery (§ 209) *only* if the movements (1) are not merely incidental to the commission of the robbery *and* (2) substantially increase the risk of harm beyond that inherent in the crime of robbery.[6] The *Thornton*

---

[4]In 1973 the Legislature adopted section 190.2, which contains a restatement of the *Daniels* test. Section 190.2 provides, "The penalty for a person found guilty of first degree murder shall be death in any case in which the trier of fact . . . makes a special finding that: . . . (3) The murder was willful, deliberate, and premeditated and was committed during the commission or attempted commission of any of the following crimes: . . . (ii) Kidnapping, in violation of Section 207 or Section 209. Brief movements of a victim which are merely incidental to the commission of another offense and which do not substantially increase the victim's risk of harm over that necessarily inherent in the other offense do not constitute kidnapping within the meaning of this paragraph." In *People* v. *Stanworth,* 11 Cal.3d 588, 599 [114 Cal.Rptr. 250, 522 P.2d 1058], we expressed no opinion as to the effect of section 190.2, and we likewise do not do so here.

[5]The People also cite *People* v. *Beamon,* 8 Cal.3d 625, 636 [105 Cal.Rptr. 681, 504 P.2d 905], in support of their assertion that it is only if both prongs of the test are met that a conviction of kidnaping for the purpose of robbery (§ 209) is invalid under *Daniels.* In *Beamon* we stated, "Without addressing ourselves to the issue whether the kidnaping was merely incidental to the robbery within the meaning of *Daniels* it conclusively appears . . . that the abduction imposed a substantial increase in the risk of harm . . . ," and we upheld the section 209 conviction. In *Beamon* the movement was for some 15 blocks. Such distance was substantial rather than brief (see *People* v. *Thornton,* 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267]) and thus both prongs of *Daniels* were not met.

[6]*Thornton* stated (at p. 768), "The fact that in each case defendant chose to consummate the robbery at a location remote from the place of initial contact does not render the subsequent asportation 'merely incidental' to the crime, for *it is the very fact that defendant utilized substantial asportation in the commission of the crime which renders him liable to the increased penalty of section 209 if that asportation was such that the victim's risk of harm was substantially increased thereby.*" (Italics added.)

dissent clearly so indicates.[7] (See also *In re Crumpton,* 9 Cal.3d 463, 466-467 [106 Cal.Rptr. 770, 507 P.2d 74]; *People v. Cleveland,* 27 Cal.App.3d 820, 825 [104 Cal.Rptr. 161]; and *People v. Lobaugh,* 18 Cal.App.3d 75, 83 [95 Cal.Rptr. 547].) That indication is correct.[8] Cases such as *People v. Stathos, supra,* 17 Cal.App.3d 33, are disapproved insofar as they are inconsistent with the views expressed herein.

Nothing in *People v. Stanworth, supra,* 11 Cal.3d 588, is inconsistent with the requirement that to convict a defendant of violating section 209 the jury must find both of the foregoing matters. *Stanworth* held (at p. 596) that the *Daniels* test is inapplicable to simple kidnaping (§ 207). *Stanworth* pointed out that both prongs of the *Daniels* test refer to robbery and that simple kidnaping may occur in the absence of another crime. *Stanworth* stated (p. 601) that the language of section 207 "implies that the determining factor in the crime of kidnaping is the actual distance of the victim's movements; and further, that the minimum movements necessary for the commission of the crime are present where the victim is forcibly taken 'into *another part* of the same county.' (Italics added.) Finally because the victim's movements must be more than slight . . . or 'trivial' . . . they must be substantial in character to constitute kidnaping under section 207." *Stanworth* involved not only section 207 convictions but also a section 209 conviction, and with respect to the latter *Stanworth* applied the *Daniels* test.

*Stanworth* further noted (p. 600) that "In *Daniels,* we observed that section 209 fails to define the term 'kidnaps' . . . and concluded that the Legislature must have intended the term to have the same meaning as the word 'kidnaping' used in section 207. (*Daniels,* 71 Cal.2d at p. 1131.)

---

[7]The *Thornton* dissent stated (at p. 771), "[W]e required in *Daniels* (at p. 1139) that to convict a defendant of violating section 209 the jury must find that the movements he compelled the victim to perform were significant displacements in space or time *and* substantially increased the risk of physical harm to the victim over and above that necessarily present in the crime of robbery." (Italics added.) Page 1139 of *Daniels* contains the language heretofore quoted above.

[8]The CALJIC instruction on kidnaping (CALJIC No. 9.23 (1973 rev.)) is in accord with cases such as *Thornton* insofar as that instruction indicates that the movements must be not merely incidental to the commission of the robbery and must also substantially increase the risk of harm beyond that inherent in the crime of robbery in order to constitute kidnaping for the purpose of robbery (§ 209). That instruction reads in relevant part: "Kidnaping is the unlawful movement by physical force of a person against his will and without his consent for a substantial distance where such movement is not merely incidental to the commission of the robbery and where such movement substantially increases the risk of significant physical injuries to such person over and above those to which such person is normally exposed in the commission of the crime of robbery *itself.*"

In sum, both *Daniels,* involving section 209 kidnaping, and *Cotton* [v. *Superior Court* (1961) 56 Cal.2d 459 (15 Cal.Rptr. 65, 364 P.2d 241)], involving section 207 kidnaping, construe the term 'kidnaping' to mean movements which are not merely incidental to associated crimes."[9] (*Stanworth,* at p. 600.) However, in view of the fact that, as we stated in *Daniels,* "section 209 prescribes increased punishment when the kidnaping is for the purpose of ransom or robbery" (*Daniels,* 71 Cal.2d at p. 1131; see also Witkin, Cal. Crimes (1973 Supp.) § 358A, p. 187),[10] violation of section 209 requires *not only* that the asportation be not merely incidental to the associated crime of robbery (i.e., that there be a kidnaping) but also that it "substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself." (*Daniels,* 71 Cal.2d at p. 1139.)

3. *Whether, As a Matter of Law, Earley's*
   *Conduct Did Not Violate Section 209*
   *As Construed in* DANIELS

(a) Whether the movements were
"merely incidental to the
commission of the robbery"

Brief movements to facilitate either robbery or robbery and rape are incidental thereto within the meaning of *Daniels.* (See, e.g., *People* v. *Stanworth, supra,* 11 Cal.3d 588 [25 feet from road to field]; *People* v.

---

[9]Section 207, of course, differs from section 209 in that violation can occur in the absence of an "associated crime." (*Stanworth,* at p. 601; see also *People* v. *Brown,* 11 Cal.3d 784, 787 [114 Cal.Rptr. 426, 523 P.2d 226]; *People* v. *Apo,* 25 Cal.App.3d 790, 797 [102 Cal.Rptr. 242].) When an "associated crime" *is* involved, there can be no violation of section 207 unless the asportation is more than incidental to the commission of that crime. (*Cotton* v. *Superior Court, supra,* 56 Cal.2d 459.)

[10]Section 209, as amended in 1951, provided that a person convicted of kidnaping for the purpose of robbery "shall suffer death or shall be punished by imprisonment in the state prison for life without possibility of parole, at the discretion of the jury trying the same, in cases in which the person or persons subjected to such kidnaping suffers or suffer bodily harm or shall be punished by imprisonment in the state prison for life with possibility of parole in cases where such person or persons do not suffer bodily harm." (Stats. 1951, ch. 1749, § 1, p. 4167.) That section was repealed in 1973 (Stats. 1973, ch. 719, § 7), and under the new section 209 adopted in 1973 (Stats. 1973, ch. 719, § 8), a person convicted of kidnaping for the purpose of robbery "shall suffer death in cases in which any person subjected to any such act suffers death, or shall be punished by imprisonment in the state prison for life without possibility of parole in cases in which any person subjected to any such act suffers bodily harm, or shall be punished by imprisonment in the state prison for life with possibility of parole in cases where no such person suffers death or bodily harm."

The penalty for simple kidnaping since 1923 has been imprisonment for one to twenty-five years. (§ 208.)

*Mutch, supra,* 4 Cal.3d 389, 397-399 [30 to 40 feet from one room to another in business establishment]; *People* v. *Williams,* 2 Cal.3d 894, 902 [88 Cal.Rptr. 208, 471 P.2d 1008] [around gas station premises]; *People* v. *Daniels, supra,* 71 Cal.2d 1119, 1122 et seq. [5 to 30 feet within own homes].) On the other hand movements to facilitate the foregoing crime or crimes that are for a substantial distance rather than brief are not incidental thereto within the meaning of *Daniels.* (See *People* v. *Thornton, supra,* 11 Cal.3d 738, 747, 750, 767-768 [movements of victims one block and four blocks]; *People* v. *Stephenson,* 10 Cal.3d 652, 657-661 [111 Cal.Rptr. 556, 517 P.2d 820] [five or six blocks].) Movements for a substantial distance within one county manifestly constitute a carrying "from one part of the county to another" (see § 207).

As heretofore appears, the movement in the instant case was 10 to 13 blocks. Movement of that distance or less has been expressly or impliedly viewed as substantial rather than brief in cases involving section 209 (*People* v. *Thornton, supra,* 11 Cal.3d 738, 747, 750, 767-768; *People* v. *Stephenson, supra,* 10 Cal.3d 652, 657-661), and section 207 (*People* v. *Stanworth, supra,* 11 Cal.3d 588, 603 [one-fourth mile]). Since the movement here was substantial, it was not "merely incidental to the commission of the robbery" (*People* v. *Daniels, supra,* 71 Cal.2d 1119, 1139), even though it may have been solely to facilitate the commission of the robbery.[11]

*People* v. *Timmons, supra,* 4 Cal.3d·411 (a four to three decision),

[11]There is no merit to an assertion by Earley that "when the robber's intent is solely to facilitate the robbery the movement is merely incidental" thereto within the meaning of *Daniels. People* v. *Williams, supra,* 2 Cal.3d 894, 902, cited by Earley, does not support his assertion. *Williams* stated that since the movements were "brief" and "solely to facilitate the commission of the robbery" they were incidental thereto. Some cases contain language that might be viewed as tending to support Earley's assertion (see, e.g., *People* v. *Iverson,* 26 Cal.App.3d 598, 605 [102 Cal.Rptr. 913]; *People* v. *Henderson,* 25 Cal.App.3d 371, 376 [101 Cal.Rptr. 129]), but, to the extent that they do so, they reflect a misconception of the first prong of the *Daniels* test in that they fail to take into consideration whether the movement was brief, and such cases are hereby disapproved.
Other cases contain language suggesting that movement is not "merely incidental" to a robbery where the movement is "necessary" or "essential" to the commission of the robbery or "an important part of [the defendant's] criminal objective, without it the crimes would not have been comitted." (See, e.g., *People* v. *Hall,* 34 Cal.App.3d 834, 846 [110 Cal.Rptr. 440]; *People* v. *Curtis,* 21 Cal.App.3d 704, 708 [98 Cal.Rptr. 775]; *In re Bryant, supra,* 19 Cal.App.3d 933, 937-938 [conc. opn.] [97 Cal.Rptr. 40]; *People* v. *Miller,* 12 Cal.App.3d 922, 934 [91 Cal.Rptr. 97].) Although one definition of "incidental" is "nonessential" (see Webster's New Internat. Dict. (3d ed.)), that manifestly was not the sense in which the word "incidental" was used in *Daniels.* Movement across a room to facilitate a robbery might be essential to the commission of the robbery but be incidental thereto within the meaning of *Daniels.* Insofar as such cases are inconsistent with the views expressed herein they are disapproved.

held a distance of five blocks to facilitate a robbery to be brief and incidental thereto. That holding in *Timmons,* however, has been impliedly overruled by *People* v. *Thornton, supra,* 11 Cal.3d 738, 747, 750, 767-768, and *People* v. *Stephenson, supra,* 10 Cal.3d 652, 657-661.[12]

> (b) Whether the movements "substantially
> increase[d] the risk of harm over
> and above that necessarily present
> in the crime of robbery itself"

"Under *Daniels,* the 'risk of harm' factor refers to the risk created by the victim's movements that he will 'suffer significant physical injuries over and above those to which a victim of the underlying crime is normally exposed'; it does not refer to the increased risk that the crime of robbery will be committed. (*People* v. *Timmons* [*supra*], 4 Cal.3d 411, 414 . . . .)" (*People* v. *Stanworth, supra,* 11 Cal.3d 588, 598.)

■   The "risk of harm" test is satisfied when the victim is forced to travel a substantial distance under the threat of imminent injury by a deadly weapon. (*People* v. *Lara,* 12 Cal.3d 903 [117 Cal.Rptr. 549, 528 P.2d 365].)[13] Here, however, Earley did not have a deadly weapon but a cigarette lighter his victim believed was a gun.

The "risk of harm" test may also be satisfied in the absence of a deadly weapon under some circumstances. For example, in *People* v. *Thornton, supra,* 11 Cal.3d 738, 750, 767-768, after 8 p.m. the defendant forced his way into one victim's car and, seizing her around the throat with his arm, informed her he wanted her money. Rather than carrying out the robbery at that location, however, the defendant drove the victim four blocks—steering with one hand while keeping her pinioned to the seat by means of his arm around her throat. After parking, defendant took

[12]*People* v. *Schafer,* 4 Cal.App.3d 554 [84 Cal.Rptr. 464], set aside two section 207 convictions on the asserted ground that they were invalid under *Daniels* since the movement of each victim was incidental to rape. One victim had been driven a distance, the longest estimate of which was a mile; the other victim, a distance of "the length of a large lot" or "a few hundred yards." Insofar as *Schafer* holds that movement for a substantial distance (e.g., a mile) can be incidental to an underlying crime it has been impliedly disapproved by *Thornton* and *Stephenson.* Insofar as *Schafer* holds the *Daniels* test applicable to a section 207 conviction, *Schafer* has been impliedly disapproved by *People* v. *Stanworth, supra,* 11 Cal.3d 588.

[13]*Lara* noted, "It takes but little imagination to envision the kind of violent events whose likelihood of occurrence is great in a situation of this kind. Ready examples include not only desperate attempts by the victim to extricate himself but also unforeseen intervention by third parties."

the victim's money and sexually assaulted her. *Thornton,* in holding that as a matter of law the risk of harm to the victim was substantially increased, reasoned (at p. 768), "Clearly any substantial asportation which involves forcible control of the robbery victim such as that occurring in this case exposes her to grave risks of harm to which she would not have been subject had the robbery occurred at the point of initial contact." (See also *People* v. *Stephenson, supra,* 10 Cal.3d 652, 657-661.)

Here, as in *Thornton,* there was substantial asportation of the victim involving forcible control. Although such control was not by the identical means as in *Thornton,* it is clear that the movements increased to some extent the risk of harm beyond that inherent in the commission of the crime of robbery itself. Under the circumstances set forth above it appears that the asportation gave rise to dangers, not inherent in robbery, that an auto accident might occur or that the victim might attempt to escape from the moving car or be pushed therefrom by Earley. The fact that these dangers did not materialize does not, of course, mean that the risk of harm was not increased. (*People* v. *Milan,* 9 Cal.3d 185, 193 [107 Cal.Rptr. 68, 507 P.2d 956].) And in our opinion it cannot be said under the circumstances here appearing that as a matter of law the increase in the risk of harm was not substantial.

*People* v. *Timmons, supra,* 4 Cal.3d 411, differs on its facts from the present case. There Mr. Baird and Miss Stephens, market employees, picked up bags containing $15,600 from a bank, and as they parked in the market parking lot upon their return from the bank defendant approached them. He stated, "This is a holdup," got into their car, and directed Baird to drive out of the lot. He further stated, "Do as I tell you and I won't hurt anybody." He asked for and received the bags of money. He directed Baird to stop some five blocks from the market and left his victims unharmed. *Timmons,* after noting that the victims drove their own car for some five blocks along a city street in broad daylight, that there was no reckless driving, that neither victim was harmed, and that neither victim observed any weapon in the defendant's possession and the court found he was unarmed, stated, "In the circumstances, this brief asportation.[14] may conceivably have increased the risk [of harm] in some slight degree beyond that inherent in the commission of the robberies, but it cannot be said to have 'substantially' increased that

---

[14]As heretofore appears, *Timmons* was impliedly overruled by *People* v. *Thornton, supra,* 11 Cal.3d 738, and *People* v. *Stephenson, supra,* 10 Cal.3d 652, insofar as it held a five block movement to be brief and incidental to the robbery.

risk." Here the distance was 10 to 13 blocks rather than 5 blocks as in *Timmons*. Further, in *Timmons* one of the victims drove during the daytime and presumably was able to give his undivided attention to driving, whereas here Earley drove at night while wearing sunglasses and holding an apparent weapon in one hand and it may be inferred his attention was divided between driving and watching his victim. Further here, unlike *Timmons*, the victim observed what he believed to be a gun in the robber's hands, the robber expressly threatened to kill him, the victim did not have a companion with him, and the robber drove from a lighted intersection to dark side streets.[15]

We conclude that the court erred in determining, as a matter of law, that Earley's conduct did not violate section 209.

The order is reversed.

Wright, C. J., and Sullivan, J., concurred.

**CLARK, J.**—I concur in the judgment and opinion of the court except insofar as it distinguishes *People* v. *Timmons* (1971) 4 Cal.3d 411 [93 Cal.Rptr. 736, 482 P.2d 648] as to the "risk of harm" factor. (*Ante,* p. 132.) *Timmons* should simply be overruled.

McComb, J., concurred.

**MOSK, J.**—I dissent, essentially for the reasons discussed at length in my concurring and dissenting opinion in *People* v. *Thornton* (1974) 11 Cal.3d 738, 770 [114 Cal.Rptr. 467, 523 P.2d 267]. It is obvious that no purpose would be served by reiterating those views in any detail at the present time. Clearly the *Thornton* majority are still in the saddle, and are still determined to ride roughshod over the intent of the Legislature expressed in Penal Code section 209, explained by us in *People* v. *Daniels* (1969) 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677], and confirmed by the recent enactment of Penal Code section 190.2, subdivision (b)(3)(ii) (*ante,* p. 127, fn. 4). Yet because the majority's misapplication of the *Daniels* rule is even more flagrant here than in *Thornton,* I am compelled to express some additional thoughts in response.

---

[15]"[A]cts of removing the victim from public view do not *in themselves* substantially increase the risk of harm within our rule in *Daniels*" (italics added; *In re Crumpton, supra,* 9 Cal.3d 463, 467), but such acts or similar ones remain a circumstance to be considered in determining whether the risk of harm was substantially increased.

At the outset I cannot refrain from observing that while we had no choice but to take the *Thornton* case because it came to us by automatic appeal, the present wound is self-inflicted. Worse, it constitutes an unnecessary waste of our limited judicial resources. Let us look briefly at the record.

On November 17, 1967, judgment was entered in the Alameda Superior Court convicting defendant on one count of first degree robbery and one count of kidnaping for the purpose of robbery. On February 23, 1973, however, Judge E. Warren McGuire of the Marin Superior Court, acting on defendant's petition for habeas corpus, found that defendant's conduct did not constitute a violation of section 209 as construed in *Daniels.* He therefore filed an order vacating the kidnaping conviction on that ground (see, e.g., *In re Crumpton* (1973) 9 Cal.3d 463 [106 Cal.Rptr. 770, 507 P.2d 74]) and remanding defendant to the Alameda Superior Court for a redetermination of the sentence to be imposed on the robbery conviction.

It may well be asked why the case did not quietly end at that point. Inasmuch as the original trial predated *Daniels,* defendant had been convicted of kidnaping on erroneous "Chessman instructions." At the time of Judge McGuire's order, defendant had already served more than six years in prison on that conviction. Even after the conviction was vacated, defendant remained subject to a sentence for first degree robbery. And no new principle of law was in issue—only the application of settled rules to particular facts. In these circumstances it would seem the state's time and resources could have been far better spent than by relitigating the entire case in the appellate courts.

Whatever their motive, however, the People did appeal. Their first effort was singularly unsuccessful: in a brief, unpublished opinion authored by Presiding Justice Draper, the Court of Appeal unanimously affirmed the order vacating defendant's kidnaping conviction. Again the matter could well have been dropped without a trace of harm to the citizenry of California.

But the People insisted on "fighting the case all the way to the Supreme Court," and managed to persuade four justices to vote for a hearing. Thus in the course of its appellate travails the case has now been twice orally argued, and the courts have been called upon to study briefs totaling over 140 pages. What has been the result of all this effort?

Although the majority purport to discuss certain rules of law, no new principles are in fact declared. In part 2 of their opinion (*ante,* pp. 126-129) the majority reject the People's totally untenable argument that if the movement of the victim is more than merely incidental to the robbery, a conviction under section 209 will survive a *Daniels* challenge even if there is no showing of a substantial increase in the risk of harm. But the unsoundness of this contention was clear from the face of *Daniels,* and as the majority recognize (*ante,* pp. 127-128), has been reiterated in both *Thornton* opinions, in *Crumpton,* in at least two decisions of the Court of Appeal, and in the relevant CALJIC instruction.

The remainder of the majority opinion is simply a misapplication of the *Daniels* principles to the facts of this case. It is not surprising, for example, the majority hold (*ante,* pp. 129-131) that defendant's movement of the victim for 10 to 13 city blocks was an asportation "into another part of the same county." (Pen. Code, § 207.) Since in *Thornton* the majority in effect defined that distance as a minimum of only one city block (see my dissent at p. 777 of 11 Cal.3d), the result is foreordained in this and all other cases subsequent to *Thornton.* The sensitive inquiry envisaged by *Daniels* into whether the movement was criminologically significant (see 71 Cal.2d at p. 1138) seems to have been abandoned in favor of the crude and arbitrary rule of "one block, one conviction."

Equally predictable is the majority's holding (*ante,* pp. 131-133) that the movement caused a substantial increase in the risk of harm to the victim. Faced with the embarrassing circumstance that the "gun" used by defendant was in fact only a cigarette lighter, the majority fall back on defendant's driving habits. They rely principally on an analogy to their affirmance of Thornton's conviction of kidnaping Eileen S. (11 Cal.3d at pp. 767-768.) In that instance the defendant drove the victim's car while steering with one hand and holding the victim with his other arm around her neck. The *Thornton* majority found a substantial increase in the risk of harm in the combination of asportation plus "forcible control" of the victim. (*Id.* at p. 768.) The present majority repeat this language and attempt to identify the "dangers" allegedly created by such "forcible control" in the case at bar. (*Ante,* pp. 131-133.)

Two such "dangers" are proposed. First, it is emphasized that defendant was driving at night while (1) wearing sunglasses and (2) holding the cigarette lighter in one hand, and that "it may be inferred" his attention was divided between such driving and watching his victim. These circumstances, say the majority, gave rise to the "danger" that an

automobile accident might occur. As I explained in my dissent in *Thornton* (11 Cal.3d at p. 778), "This scenario *might* have come true, of course; even the most careful driver is daily exposed to the *possibility* of accident and injury. But in the case before us the question is whether there was a *substantial* risk, within the meaning of *Daniels,* that such a result would actually occur."

When we examine the record in this connection we find no evidence whatever of the tint of defendant's sunglasses, or of how "dark" it really is in Oakland at 10 minutes to 5 on a July morning.[1] Nor is there any showing that defendant steered the car with one hand throughout the asportation, or when necessary was incapable of grasping the wheel with both hands even while holding the simulated gun; in that regard, reason tells us there is a significant difference between simply driving with one hand and driving with one hand but with the other forcibly restraining a kidnaping victim by the neck.

Even more speculative is the majority's second proposed "danger," i.e., that the victim "might attempt to escape from the moving car or be pushed therefrom by Earley." (*Ante,* p. 132.) What possible basis in the record is there for these flights of fancy? There is not the remotest indication that Mr. Schopfer ever entertained the notion of leaping, Douglas Fairbanks-like, from the moving vehicle: he is a nightshift worker at the Oakland airport, not a celebrated movie stuntman. It is also highly unlikely that defendant would have "pushed" Mr. Schopfer out of the car *before* the robbery, as the sole purpose of the asportation was to relieve him of his valuables. Nor is there the slightest evidence suggesting that *after* the robbery defendant was inclined to forcibly eject his victim and speed away with the vehicle; on the contrary, he not only left Mr. Schopfer in command of his car but placed the ignition keys on a nearby street corner exactly as he had said he would do.

On the present record it is no answer to say, as do the majority *(ibid.),* that "The fact that these dangers did not materialize does not, of course, mean that the risk of harm was not increased. (*People* v. *Milan,* 9 Cal.3d 185, 193 [107 Cal.Rptr. 68, 507 P.2d 956].)" The logical flaw in this argument is that disproving the negative does not prove the positive: whether or not the hypothesized dangers ever "materialized," there must still have been a factual basis for believing they were real. It is this factual basis which is entirely lacking in the majority's speculations.

---

[1]"Darkness," I note, is defined in Vehicle Code section 280 as ending "one-half hour *before* sunrise" (italics added).

The point may be illustrated in two ways. First, by contrasting the present record with the facts of the very case cited by the majority: in *Milan* the defendant commandeered a taxicab with a loaded gun. He first held his gun against the back of the head of a trainee riding in the front passenger seat. The driver intentionally ran a stop sign in an attempt to attract the attention of the police. The defendant shot a hole through the windshield, shifted his gun to the back of the driver's head, and told the latter that the next bullet would be for him and to "stop looking for stop signs, and if a police vehicle shows up, you're dead." The driver nevertheless continued to try to capture police attention by committing additional traffic violations, including going through two or three more stop signs, speeding, and running a red light. In such circumstances the chances that a traffic accident might occur or the kidnaping victims be shot were obviously very high; the dangers were real and pressing, not conjured up by an appellate court in the quiet of its chambers at some later date. In the case at bar no such highly dangerous risk-creating events ever took place.

Second, an argument *ad absurdum* may perhaps persuade where reason fails. In my *Thornton* dissent (11 Cal.3d at p. 782) I surmised that the majority would draw the line at affirming a conviction under section 209 of a would-be robber who rendered his victim unconscious or securely bound and gagged him before driving the minimum required distance. I assumed that because in such a case the robber could give his undivided attention to driving and the victim could not jump from the moving car, the majority would find no substantial increase in the risk of harm. Here at last, I thought, was a case in which legislative intent would be respected and the defendant would be convicted of robbery and simple kidnaping only. I now see that I underestimated the majority's fertile imagination. When the suggested case reaches this court—and one day it will—the majority will find it possible to affirm on the theory, here enshrined, that the defendant might nevertheless have "pushed" his bound or unconscious victim out of the vehicle at some point during the trip. If that prospect is not deemed sufficiently grave to justify a life sentence, the majority are apparently prepared to invent some hitherto undreamed of "danger" allegedly created by the asportation—perhaps that an earthquake might occur in the next block and the car be swallowed up in a yawning chasm, or that a tornado might sweep the street and hurl the vehicle into yet another part of the county. And if it be objected that these are somewhat fanciful fears the majority will once again be able to say, "The fact that these dangers did not materialize does not, of course, mean that the risk of harm was not increased."

What is left of the *Daniels* rule after today's decision? Although the ratio decidendi of *Daniels* was that "when the statute [i.e., § 209] is properly construed the evidence there introduced was insufficient to support the judgments" (*People* v. *Mutch* (1971) 4 Cal.3d 389, 395 [93 Cal.Rptr. 721, 482 P.2d 633]), that act of statutory construction served the important purpose of saving the offense of aggravated kidnaping from a charge of unconstitutional disproportionality. Under the subsequently declared rule of *In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921], "a punishment may violate article I, section 6 [now § 17], of the Constitution if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (Fn. omitted.) An inevitable corollary of that rule (see *id.* at p. 426) is that when the Legislature prescribes penalties of vastly different severity for two generically comparable acts, the more drastic punishment will be constitutionally suspect unless it is limited to conduct which is proportionately more dangerous to society. (Compare Pen. Code, § 241 [simple assault, fine up to $500 and/or jail up to 6 months] with Pen. Code, § 217 [assault with intent to commit murder, 1 to 14 years in prison].)

In footnote 10 of their opinion the majority recite the statutory provisions for punishment of simple kidnaping and kidnaping for robbery. Let there be no mistake about the immense practical differences between these penalties. The sentence of a defendant convicted of simple kidnaping may be fixed at as little as 12 months; and if a longer sentence is imposed, he may nevertheless be paroled after that same 12-month period. (Pen. Code, §§ 208, 3049.)[2] On the other hand, a defendant convicted of kidnaping for the purpose of robbery must be sentenced to death or life imprisonment without possibility of parole if the victim dies or is harmed; and if, as here, the victim suffers no injury whatever, the defendant must still be given a life sentence. (Pen. Code, § 209.) It is true in that case he will be entitled to parole. But he will not even be eligible for parole consideration until he has served at least seven years in prison (Pen. Code, § 3046), and in practice such parole is not ordinarily granted for approximately the first ten years.[3]

[2]In practice, of course, paroles are not ordinarily granted immediately upon expiration of the minimum date. In the case of simple kidnaping, a statistical survey by the Department of Corrections dated February 26, 1974, discloses that in 1973 the median time served before first parole by males convicted of this offense was 42.5 months.

[3]The survey cited in the preceding footnote reveals that in 1970, the most recent date for which significant figures are available, the median time served before first parole by males convicted of violating section 209 was 111 months.

There is, moreover, a still more important consequence which is widely misunderstood by the public and the bar alike. The "life" term imposed for aggravated kidnaping is far different from the "five to life" term imposed for first degree robbery and a number of other offenses: the latter is a theoretical life maximum, but the former is an actual life minimum. Thus the robber will not only be released on parole far sooner than the kidnaper,[4] but his total term—served both in and out of prison—may be as little as 5 years and usually is less than 10 years. In stark contrast, if·and when a defendant convicted of violating section 209 is finally released on parole *he will remain on parole for the rest of his life*.[5] No matter ·how mitigating the circumstances of his offense, no matter how complete his rehabilitation and how exemplary his behavior after release, he has no right ever again to be a free man.

This disparity in the kidnaping penalties furnishes the yardstick by 'which to judge how "substantial" must be the increase in risk of harm in order to support a conviction under section 209: the increase, I submit, must be proportionate to the difference in penalties. If it is not, there is no justification for convicting the defendant of aggravated rather than simple kidnaping. And in that event, the punishment inflicted will be unconstitutionally disproportionate to his conduct within the meaning of *Lynch.*

The majority impliedly recognize this relationship. (*Ante,* pp. 128-129.) In fact, however, they pay it no more than lip service. When the·majority pass from general statements of principles to application of those principles to the case at bar, a very different rule emerges: in reviewing the record the majority conclude (*ante,* p. 132), "it is clear that the movements increased *to some extent* the risk of harm beyond that inherent in the commission of the crime of robbery itself." (Italics added.) The emphasized language, of course, totally undermines the principle of constitutional proportionality: *any* forcible movement of the kidnaping victim conceivably increases the risk of harm "to some extent." If such a minimal showing is all the majority now require to affirm a conviction under section 209, the "current of common sense" which flowed through our *Daniels* decision (71 Cal.2d at p. 1127) has indeed been reversed.

---

[4] The survey cited in footnote 2, *ante,* shows that in 1973 the median time served before the first parole by males convicted of first degree robbery was only 36 months.

[5] Unless, of course, he is returned to prison for violation or his sentence is commuted by act of executive clemency.

The majority tell us (*ante,* pp. 130-131) that insofar as *People* v. *Timmons* (1971) 4 Cal.3d 411 [93 Cal.Rptr. 736, 482 P.2d 648], held a five-block movement to be merely incidental to a robbery, it was "impliedly overruled" by *Thornton.* Are we to expect that in the next aggravated kidnaping case to reach this court the majority will announce—*mirabile dictu*—that insofar as *Daniels* required a truly substantial increase in the risk of harm to support the conviction it was "impliedly overruled" by the case at bar? I can draw no other conclusion, despite the clear approval of the *Daniels* concept expressed by the Legislature. (Pen. Code, § 190.2, subd. (b)(3)(ii).)

At the close of my *Thornton* dissent (11 Cal.3d at p. 783) I expressed the sincere hope that the majority's decision would be "no more than a passing aberration unfortunately confirming the old adage that hard cases make bad law." For *Thornton* was a "hard case": the defendant had all the earmarks of a vicious and depraved "sex fiend," and the majority were evidently prepared to go to any lengths to insure that he not "walk the streets" again. But the matter now before us is not a similar "hard case." The probation report reveals that Wayne Earley is a product of the Oakland black ghetto, a shattered home, and total parental neglect. He was only 20 years old at the time of the crime. He was unarmed, and Mr. Schopfer suffered no physical injury or indignity whatever. The entire event cannot have taken more than 15 minutes, and when it was over Mr. Schopfer had lost only $8 and his watch. When Mr. Schopfer asked for the return of his car keys, defendant promised to leave them on the curb at the next corner, and he kept his promise. He was arrested in the same neighborhood a few days later, and offered no resistance.

Yet for this conduct defendant has now served more than seven years in state prison. He has already spent far longer behind bars than the average defendant convicted of such truly violent crimes as second degree murder, manslaughter, assault with intent to commit murder, and forcible rape.[6] Even his eventual release on parole is problematical, as the trial judge has recommended to the Adult Authority, in a statement filed pursuant to Penal Code section 1203.01, that defendant "serve out his life sentence without parole." In these circumstances the order of Marin Superior Court Judge McGuire vacating the kidnaping conviction and remanding defendant for resentencing on the robbery conviction is

---

[6]The survey cited in footnote 2, *ante,* states that in 1973 the median time served by males before first parole for the above-listed crimes ranged from 36 to 54 months.

not only legally sound, it is humane. I am at a loss to understand why the majority are not content to let that order stand. Even easy cases, it now appears, can make bad law. And when they do, it is all the more inexcusable.

Tobriner, J., concurred.

Respondent's petition for a rehearing was denied June 4, 1975. Tobriner, J., and Mosk, J., were of the opinion that the petition should be granted.